### THE PEOPLE *v.* PETER W. ROFF.

The board of health of the town of Castleton, in the county of Richmond, has no power to make a regulation prohibiting all persons from passing from within the quarantine inclosure, situated in that town, into any other part of the town. Such a regulation is in conflict with the powers conferred by the state on the officers of the quarantine establishment: and where a person had been arrested and committed, charged with a misdemeanor for violating such a regulation, he was discharged on *habeas corpus*.

The powers of a board of health organized under chapter 324 of the Laws of 1850, considered and explained.

ON the 16th of August, 1856, on the petition of Peter W. Roff, alleging that he was then illegally restrained of his liberty, and imprisoned in the common jail of Richmond county, a writ of *habeas corpus* to the keeper of the jail was allowed, returnable on the eighteenth. The writ was then returned, and the prisoner brought up. The return showed that he was imprisoned by virtue of a commitment by Theodore Frean, one of the justices of the peace of Richmond county, dated on the fourteenth of August, of which commitment a copy was annexed to the writ and return.

The People *v.* Roff.

The commitment recites that Roff had been that day brought before the justice, charged, on the oath of John B. Giles, who made complaint, before said justice, in the words and figures following, to wit: " That on or about the 7th day of August, 1856, the supervisor and justices of the peace of the town of Castleton, in said county, were duly organized as a board of health, in and for said town, pursuant to statute in such case made and provided; that on the seventh day of August instant, the said board duly met in said town, and made certain regulations to regulate, prohibit and prevent communication and intercourse with a certain place in said town, in which there were persons who had been exposed to infectious and contagious disease, to wit, with a certain place commonly known as the quarantine inclosure; that among said regulations was one prohibiting all persons passing from within the said quarantine inclosure into any other part of said town, which said regulations were then and there duly published, pursuant to statute; that afterward, to wit, on the 14th day of August, 1856, one Peter Roff did, at the town and county aforesaid, knowingly and willfully violate the aforesaid regulations of said board of health, so published as aforesaid, by willfully passing from within the said quarantine inclosure into another part of said town, to wit, into the village of Tompkinsville; and, after examination had, in due form of law, touching the said charge and accusation, the said justice did adjudge and determine that the said offence had been committed, and that there was probable cause to believe the said Peter Roff to be guilty thereof."

The commitment, after further reciting that the said Peter Roff had not offered sufficient bail for his appearance to answer the said charge at the next court having criminal jurisdiction, commands the keeper of the jail to receive Roff into custody in the jail, and detain him till discharged according to law.

It appearing from this return that the party was detained
upon a criminal accusation, notice was given, by order, to
the District Attorney of Richmond county, as required by 2
*Revised Statutes* (*p.* 569, § 47), as amended by *Laws of* 1837
(*ch.* 240, § 2), and the hearing was adjourned till he should
attend. The case was then elaborately argued on both
sides.

*E. W. Stoughton,* for the prisoner.

*Lott C. Clark,* for the people.

BIRDSEYE, J. The thirty-eighth and thirty-ninth sections
of the *habeas corpus* act (2 *R. S.*, 567), make it my duty to
" proceed to examine into the facts contained in the return,
and into the cause of the confinement of" the prisoner; and
"if no legal cause be shown for such imprisonment or
restraint, or for the continuation thereof," to discharge him
from custody.

The prisoner has not denied any fact set forth in the jailor's
return, or alleged any fact to show that his imprisonment is
unlawful, or that he is entitled to his discharge, as he might
do by section forty-eight of the statute. But he contends
that the commitment set forth in the jailor's return does not
show that any crime had been committed, for the reason
that the regulation of the board of health of Castleton, set
out therein, is illegal and void, as contravening the policy
of the law and the provisions of the statute in reference to
the quarantine establishment of the state. If this be so,
there is " no legal cause shown for such imprisonment," and
the prisoner is by law entitled to his discharge.

By the *Laws of* 1850 (*ch.* 324, *p.* 691, § 2), it is enacted
that " the supervisor and justices of the peace, or the major
part of them, of each town in this state, shall be a board
of health for such town for each year, whenever, in the
opinion of a majority of such board, the public good
requires it."

The third section of the act prescribes the powers and duties of the board of health thus constituted. That these are very broad and comprehensive will appear from an examination of the several subdivisions of this section, the third and fourth of which are these:

" 3. To make regulations, in their discretion, concerning the place and mode of quarantine; the examination and purification of vessels, boats and other crafts not under quarantine; the treatment of vessels, articles or persons thereof; the regulation of intercourse with infected places; the apprehension, separation and treatment of emigrants and other persons who shall have been exposed to any infectious or contagious disease; the suppression and removal of nuisances; and all such other regulations as they shall think necessary and proper for the preservation of the public health.

" 4. To regulate and prohibit or prevent all communication or intercourse by and with all houses, tenements and places, and the persons occupying the same, in which there shall be any person who shall have been exposed to any infectious or contagious disease."

By section four of the same act, every person who shall willfully violate any regulation so made and published by any such board of health is declared guilty of a misdemeanor, and, on conviction, is made subject to fine or imprisonment, or both, at the discretion of the court, the fine not to exceed $1000, nor the imprisonment two years.

If the board of health of Castleton had the power to make the regulation in question, then the prisoner is clearly enough charged with a crime, and is liable, on conviction, to punishment more severe than many persons suffer on conviction for felonies.

The real question presented for my decision, therefore, is, whether the board of health of the town of Castleton had,

under the statutes above cited, the power to make a regulation prohibiting all persons from passing from within the quarantine inclosure into any other part of said town.

It is deeply to be regretted that any such collision should have arisen between this board of health, thus temporarily organized, and the officers whom the state has appointed to take charge of its quarantine establishment. It is the duty of those officers, and the state has given them sufficient powers, to protect the health of the town of Castleton, and the other towns in Richmond county, as well as of the cities bordering on the waters and rivers of the port of New-York. On the due performance of these duties, and the efficient exercise of these powers, may depend the health and lives of vast numbers, not merely in all these towns and cities, but throughout the whole state, and it may be the whole country. While the inhabitants of each town are justly entitled to exercise every lawful power for their own protection, and will be sustained by this court to that extent, it is not less my duty to see that they do not overstep that just limit, and, under the influence of perhaps a natural alarm at the approach of infection and disease, seek their own safety at the expense of the health of the community at large.

Such a conflict has never before disturbed our peace. If the rights and powers of the parties to the present dispute be clearly defined by the law, harmony will be restored, and, it is to be hoped, the wise and beneficent purposes of our health laws permanently secured.

But it is not merely the powers of the board of health thus organized in Castleton, with reference to the quarantine establishment of the state, that renders this case one of importance. If this regulation is valid, every other town in the state may pass a like ordinance. It may prohibit the entrance into any part of the town, not merely of persons from the quarantine establishment of the state, in charge of its health officer, and the other functionaries whom the state has appointed to assist him, but of persons from any other

town in the state, even though the board of health of such town may not think that any disease exists within it, or may decide that every case of disease has been cured. What the town of Castleton here assumes to do, towards that institution of the state, may be done towards the same town by every other town in Richmond county, or in Kings, or in any portion of the state.

So far as I discover, by a hasty reference to our statutes, the first law of the state on the subject of quarantine was the " Act to prevent the bringing in and spreading of infectious distempers in this state," passed 4th May, 1784, at the seventh session of the legislature. (1 *Greenl. Laws N. Y.*, 117.) By this act, quarantine was to be performed at Bedlow's Island, or in such other place, and for such time, and in such manner, as the governor—to whom, by the act of March 29, 1784 (*id.*, 69), the island, called Governor's or Nutten Island, was assigned—or, in his absence from the city of New-York, as the mayor thereof should direct and appoint. This act contains the germ of our present quarantine system; and the provision in section three, for the appointment, by the governor and council, of a physician to inspect all vessels which may have on board, or which may be suspected of having on board, any person or persons infected with a contagious distemper, is probably the earliest provision of law in the state for the selection of a person to perform the duties of the present health officer of the port of New-York.

This act was amended on the 27th March, 1794 (3 *id.*, 146), and by section five of the amendatory act the governor was authorized to appropriate Governor's Island for the purpose of erecting buildings, &c., for the reception or accommodation of any persons infected with any such distemper. On the 1st of April, 1796, another act was passed (*id.*, 305), the first provision of which is: " That a person practicing physic shall be appointed health officer for the city of New-York;" and extended powers are conferred upon him, most

of which he possesses to this day. By the fourth section, the governor was authorized to "cause a building suitable to serve for a lazaretto, the expense whereof, exclusive of the moneys to be expended for the purchase of lands, if any shall be purchased, not to exceed the sum of two thousand pounds, to be erected on Nutten Island, or on other lands which may be deemed more eligible, and which other lands he is hereby authorized to purchase for the people of this state for the reception of persons," &c., subject to quarantine. The act of February 10, 1797 (*id.*, 367) extended the powers of the health officer to coasting vessels coming from any place south of Cape May, if he should "deem it expedient."

By the act of March 30, 1801 (1 *Webs. Laws N. Y.*, 361), it was enacted "that there shall continue to be a health office in the city of New-York, under the superintendence of three commissioners, who shall consist of a health officer, and of a physician, to be styled the resident physician, and one other person; that the health officer *shall reside at Staten Island*, the resident physician in the city of New-York, and the other commissioner at or *near the Marine hospital on Staten Island*, or in the city of New-York, as a majority of said commissioners may deem most proper."

This act fully established a quarantine system substantially like that of the present day. Many of its provisions continue through all subsequent revisions almost unchanged till now. The twentieth section (*id.*, 368) declares: "That the hospital erected on the easterly part of Staten Island shall continue to be denominated the Marine hospital, and shall, together with the other buildings and improvements made or to be made thereon, at the discretion of the said commissioners, and the land adjoining the same and belonging to the people of this state, be holden by the commissioners of the said health office in trust for the use of the people of this state, and the purposes specified in this act; and all vessels subject to quarantine shall come to anchor as near as may be to the said hospital, which is hereby declared to be the

anchoring place for vessels at quarantine; that the said health officer shall be physician of the said hospital, and the said commissioners of the health office shall in other respects have the superintendence thereof, and employ mates, nurses and attendants, and provide bedding, clothing, fuel, provisions, medicine, and such other matters as shall be requisite therein; and it shall be lawful for them to make reasonable rules and orders for the government and management of the said hospital."

The provisions in section twenty-two of this act, in regard to persons eloping from quarantine, their apprehension and delivery to the health officer, to be detained at quarantine till regularly discharged by him, closely resemble some of the provisions of *Laws of* 1856 (*ch.* 147, § 14).

By this act (that of 1801), the quarantine establishment was reduced to a regular system, and endowed with vigorous and efficient powers. It had then been already located where it now is, and the hospital had been erected; doubtless under the authority conferred on the governor by section four of the act of April 1, 1796. It has ever since continued in that location, and has been the object of the constant attention and care of the legislature. The numerous laws that have since been passed, and the generous grants that have at times been made for its support, evince an unvarying design, on the part of the state, to omit nothing essential to the completeness and efficiency of the establishment. And if the intention of the legislature may be inferred from their silence, as well as from their enactments, this quarantine establishment was deemed amply sufficient to guard the health of the whole state. For, until a very recent period, it was, if I mistake not, with the exception of the boards of health of New-York, Albany, and a few similar places, the only regularly constituted sanitary authority, and the only permanent sanitary establishment in the state.

The provisions of sections thirty-four and thirty-five of this act (1 *Webs.*, 374), which are the same as those of the

*Laws of* 1811 (*ch.* 175, § 33), which latter was revised and reënacted on the 26th of March, 1813 (2 *R. L.*, 536), seem to contain the only warrant for the exercise, by the officers of the towns, of any of the powers of a board of health. The same provisions are contained in sections forty and forty-one of the "Act to provide against infectious and pestilential diseases," passed April 14, 1820, by section forty-five of which the former act seems to have been repealed. (*Laws of* 1820, 222, 223.)

That act was repealed, and another with the same title enacted in its stead, on the 21st of March, 1823. (*Laws of* 1823, *ch.* 82, *p.* 54, § 51.) Sections forty-four and forty-five of this latter act are evidently a revision of and a substitute for sections forty and forty-one of the act of April 14, 1820. But, in the revision, all the powers of the town officers are taken away, and the health laws are confined to quarantine and the cities of New-York, Albany and Hudson, and the town of Brooklyn.

The act of March 21, 1823, was repealed by the general repealing act, passed on the adoption of the Revised Statutes. (3 *R. S.*, 146, *pl.* 383.)

The fourteenth chapter of the first part of the Revised Statutes, as proposed by the revisors, contained no provision similar to those referred to in sections thirty-four and thirty-five of the act of March 30, 1801, and of some subsequent laws. (2 *Revisors' Rep., ch.* 14, *p.* 42.) In the enactment of this chapter, the legislature inserted section twenty-two of title seven. (1 *R. S.*, 451; 3 *id.*, 504, 2*d ed.*) This section provides that "any two justices of the peace, in any town of this state, may cause all persons who shall be sick of any infectious or pestilential disease, and *not being residents of such town*, by an order in writing, *to be removed to such place of safety within the town* as they shall deem necessary for the preservation of the public health."

Such has been the general course of the legislation of the state, and such the comparative care and attention bestowed

The People *v.* Roff.

by the legislature on the quarantine establishment, on the one hand, and the subject of sanitary powers and regulations, in the towns of the state, on the other, up to the passage of the " Act for the preservation of public health," on the 10th day of April, 1850. (*Laws* 1850, *ch.* 324, *p.* 690.) But on the same day an elaborate " Act relating to the public health in the city of New-York," was passed (*Laws* 1850, *ch.* 275, *p.* 597), which seems (*id.*, 615, § 38) to be a careful revision of all statutory provisions on the subject of the act up to that time.

It is, in my judgment, clearly my duty to construe these two laws, or such as may be substituted for one or the other of them, together ; so that both may stand, if it be possible. If that cannot be done, if they are irreconcilably in conflict, then it seems to me that the institution of the state, founded almost with the state itself, the object of its bounty and its constant legislative attention, presided over by officers carefully selected by the highest executive authorities of the state, and who are vested with large powers and set apart for the performance of highly important and delicate duties, permanent, comparatively speaking, in the tenure of their offices, presiding over the health of great cities which are exposed to infections by a widely extended commerce with all the ports of the world ; that institution is to be preserved, to be kept in full vigor and efficiency ; it is not to be sacrificed to the local, limited board of health of a town or village, whose members may change from year to year, meeting only when " in the opinion of a majority of such board the public good requires it," and composed in many, if not in almost every case, of men not physicians, or familiar with disease.

It was expressly conceded on the argument, and, had it not been, I am bound judicially to notice, that that place in the town of Castleton mentioned in the regulation of its board of health, and there stated to be " commonly known as the quarantine inclosure," is the quarantine establishment of the

state, and that it includes the marine hospital mentioned in the *Laws of* 1850 (*ch.* 275, *tit.* 2, § 1), and in the *Laws of* 1856 (*ch.* 147, § 1).

It is not to be denied that very broad and extensive powers are conferred upon the boards of health of the several towns of the state by section three of the "Act for the preservation of the public health." Subdivision four of this section, as above stated, gives such boards power " to regulate and prohibit or prevent all communication or intercourse by and with all houses, tenements and places, and the persons occupying the same, in which there shall be any persons who shall have been exposed to any infectious or contagious disease."

It was claimed on the argument that this authority was broad enough to warrant the framing of the regulation now under examination; and so, indeed, it does in terms appear to be.

It must be remarked, however, that a comparison of the two acts will not show any necessary conflict between them. Their provisions harmonize. As they were passed together, so, it seems to me, they can stand together, if the officers appointed to carry them into effect act in the proper spirit. But when a comparison is instituted between this regulation of the board of health of Castleton and the statutes establishing and regulating the hospital and quarantine establishment, they are found to be in irreconcilable conflict. The regulation must therefore be void.

This board of health, like the directors of a corporation, in framing its by-laws, was bound to frame them so as to accord with, not to violate, the provisions of the law. The legislature had a right to presume that the board, in making their regulations under this section, would act in obedience to other statutes, instead of attempting to suspend or repeal them. The legal obligation so to do is as apparent as if a proviso had been added to the section expressly declaring that the ordinances of the board were to be such only as

should not conflict with the constitution or laws of the state. It could never have been the intention of the legislature to put into the hands of any board or tribunal in the state the power to suspend, or repeal, or override a statute; and that, especially, when the repeal would be merely local and temporary, like the sessions of the board of town officers in a sickly season.

It was, however, insisted by the counsel for the people that this regulation, which "prohibits all persons from passing from within the quarantine inclosure into any other part of the town of Castleton," was not invalid or void, because the inmates of quarantine might, by shipping or boats from its water front, pass entirely round the town of Castleton, and land in other towns or counties. It is at least very doubtful, upon a comparison of the sweeping terms of this regulation with the boundaries of the county of Richmond and town of Castleton, as fixed by law (3 R. S., 2, pl. 4, 3d ed.; id., 20, § 4, pl. 1), whether even that mode of exit from quarantine is not a misdemeanor, punishable by fine and imprisonment, if this regulation is valid; for the county and town are bounded northwardly and eastwardly "by the middle of the main channel of the bay and harbor of New-York," and it will be difficult to establish that the lands and waters covering them, between the shore and the middle of the channel, are not "within the quarantine inclosure," and, on the landward side, the town of Castleton wholly incloses the quarantine. Let it be admitted, then, as contended, that this argument is a verbal subtlety, and let us assume that egress from quarantine by water is not prohibited by this regulation of the board of health, yet, if this board can do what they claim the right to do on the landward side of quarantine, may they not also on the seaward side? And if so, what this town does upon one of the boundaries of quarantine may be done along the boundaries of every town in the state, if, in the opinion of the majority

of the board of health of the town, "the public good requires it." What is, then, the state of things in quarantine?

At some seasons, we know that emigrants arrive there in great numbers, and the hospitals are filled. A panic is of easy growth. The inhabitants of the adjoining towns become alarmed: it may be, with some just grounds of apprehension; perhaps without such grounds. If three out of the five men composing the town boards of health shall be of the opinion that "the public good requires it" (rather an indefinite rule of action), they may pass an ordinance like the one in question, and absolutely prohibit the coming among them of any person from quarantine. How, then, are the health officer and the physician of the hospital to provide nurses, servants, attendants; to obtain food, clothing, medicines? How are the pilots of the port to perform their duties? They are by law (*Laws* 1856, *ch.* 147, §§ 8, 9, 10) to bring every vessel they find to be infected into the anchorage at quarantine, and to report all the violations of that law, as soon as may be, to the health officer. Can they, by merely stepping on the deck of a vessel outside Sandy Hook, and going ashore from it at quarantine, to report to the health officer, be prevented by a regulation like this from pursuing their calling? For that is, or may perfectly well be, the effect of such a prohibition. And what, then, becomes of the commerce of the port?

By section fifteen of the same act, the commissioners of emigration are required to "remove from the marine hospital and take charge of all indigent emigrants whose quarantine has expired, and who shall have sufficiently recovered from the diseases with which they were admitted, on the notification, in writing, of the health officer that such removal will not, with ordinary care, endanger the safety of the individual or the health of the community." Suppose such a notice to be given by the health officer to the commissioners of emigration: one of them goes into the quarantine inclosure, with proper assistants and means of conveyance, to remove

such emigrants; but, on offering to leave quarantine, the way is absolutely closed by this ordinance of the town of Castleton. He turns to the next adjacent town on the island, or to the contiguous town in Kings county, and finds, or he may find, if this ordinance is valid, a similar barricade blocking his way there. But the statute requires that he "shall remove" the emigrants and take charge of them. Whom shall he obey, the officers of these towns or the statutes of the state?

But this is not yet a full statement of the case. The health officer himself, as well as the physician of the hospital, and all their deputies, assistants, nurses and orderlies, are clearly within the terms of the regulation, and are absolutely prohibited from passing out of the quarantine inclosure. The health officer is (*Laws* 1850, *ch.* 275, § 4) made one of the commissioners of health of New-York city. By other provisions of the statute, he is required to attend the meetings of the commissioners, at the city hall, in New-York, daily; while he is also required by law " to reside within the quarantine inclosure." How is he to comply with these several requirements? If he can be prevented from making use of the streets in Castleton, its docks and wharves, and the same ferry accommodations that other residents of that town avail themselves of in passing to and from his duties in New-York, is he not seriously crippled in the performance of functions of the most vital importance to the whole population of all these cities and towns? He is, in my judgment, clearly entitled to enjoy every facility for the discharge of his onerous duties; and this as well from the clear spirit of the law as from the express provisions of the statute, that " it shall be the specific duty of all magistrates and civil officers, and of all citizens of the state, to aid, to the utmost of their power, the board of health, and all the health officers mentioned in this act, in the performance of their respective duties." (*Laws* 1850, 615, § 36.) But if this regulation is valid, a similar act of the board of health in New-York may

prohibit his landing on any wharf or passing through any street in that city, and absolutely prevent the performance of his statutory duties.

It was, however, contended on the argument that he had no right or power to perform any official act or discharge any duty outside the quarantine inclosure. There are many other provisions of law than those above referred to, which show that he may, if they do not clearly require that he shall, go abroad from the inclosure to perform his duties. (*Laws of* 1856, *ch.* 147, §§ 12, 13, *subds.* 1–4, § 14, *&c.*) But were the position correct, it is, at least, a matter of doubt if that officer, whom the state has selected to ward off infection and disease from its whole people, can, by the board of health of a city or town, be declared to be so dangerous to public health, by reason of the mere performance of his statutory duties, that he may be absolutely prohibited from leaving the quarantine inclosure. If he may, then the board of health in Northfield or Southfield might impose the like restraint on the physician who has been appointed health officer of Castleton by its board of health, should it be found that he was attending a case of small-pox or infectious fever.

But it was also contended, in argument, that this regulation might be void so far as the health officer was concerned, and yet be good as to the prisoner and others.

Although I cannot admit the soundness of the position, nor allow that a prohibition to all persons means, and shall include, only certain classes of persons, and may therefore be valid, still, it may be proper to treat it for a moment as sound, and to look at the regulation from another point of view.

Suppose a person, no matter whether he be a destitute seaman or emigrant, or the wisest, best and richest citizen in the state, has arrived at the anchorage ground in a vessel, and has been found sick with the yellow fever; has been sent by the health officer to the marine hospital; has been

attended there by its physicians and nurses, and has been reported by the physician, to the health officer, " as sufficiently recovered from sickness to be discharged from the hospital " (*Laws of* 1856, 239, § 35, *subd.* 3); suppose him, also, to have received from the health officer such a discharge as that officer is, by section fourteen of the same act, authorized to grant : what are the rights of such a party ? The state has subjected him to a long confinement, it may be to a very onerous one, at great loss in a pecuniary point of view, and to the deprivation of many comforts which he might have enjoyed at his own dwelling, outside the quarantine inclosure. To have gone out, even to his own house, would have made him " guilty of a misdemeanor, punishable with or by fine and imprisonment." (*Id.*, § 13.) But he has submitted to all the requirements of the state authorities, and has passed through the period of quarantine. Has not the state, by imposing these penalties, incurred reciprocal duties ? Shall it not in return assure to him the right of restoration to civil and social life ? Can it be that upon the outside of the wall there are another set of functionaries, who may subject him to another similar detention? But let him submit to that in Castleton ; is he still safe ? When he reaches Northfield or Southfield, or crosses into New Utrecht, may not each of those towns, in succession, " put him to his purgation ?"

And where shall this state of things stop ? Clearly, if it may exist in Castleton, it may in every town between that and Canada. The result shows the entire absurdity of the attempt to assume such powers. It shows that the decision of the proper officers in quarantine is final and conclusive; that at least there is not, and in the nature of things cannot be, any such board of appeal from those decisions as the town authorities of Castleton have sought to set up.

I have said that this illustration shows the entire absurdity of the regulation in question. That, however, is not strictly true. For the regulation " prohibits all persons from coming

from the quarantine inclosure into any other part of the town." It does not allow to the outside board of health themselves, or to any other authority, either the right or the power to examine persons offering to leave quarantine; to decide that some are fully cured, and may, therefore, again mingle in life, while others are not yet fully freed from infection, and therefore require further care, and to be sent to the lazaretto of the town, that their cure may be completed.

The health officer can send to the hospital only those that are sick, and can retain in quarantine only for limited periods those who have been exposed to infection. But this regulation sentences all persons, well or sick, whether exposed to infection or not, to an unlimited imprisonment. That imprisonment, too, it may be added, is not such an one as under any quarantine law can be adjudged to be valid; for it is one where the restraining power does not take, and cannot by possibility take, any measures whatever either to support the life or to improve the health of the party confined, or to free him from infection, that at some future period he may again enjoy the privileges of a member of society.

Such a regulation is clearly not a compliance with the provisions of the statute constituting the town boards of health. With the power to prohibit is given, also, the power to regulate. The fourth subdivision " authorizes them to regulate and prohibit or prevent all communication or intercourse," &c. In my judgment they must exercise the powers of regulating and of prohibiting together. They can exclude from their limits, not "all persons," but such only as, on a proper examination, may be found dangerous to the health of the town. Certainly no person can look through the numerous statutes which the legislature have so carefully framed for the regulation of their officers at quarantine, and can observe with what caution every provision is made subservient to the comfort of patients and to

The People *v.* Roff.

their prompt restoration to sound health and to their duties in society, and be blind to the fact that this regulation, now sought to be enforced by fines and imprisonments, is at open war with the whole policy of the state from its foundation. It assumes powers and claims rights and privileges never yet arrogated by the supreme legislative body of the state, that fountain whence this board derives not only its authority, but its very existence. To sustain such assumptions is to create in every town in the commonwealth an irresponsible tribunal, whose only rule of action shall be what, in their opinion, " *the public good requires.*"

The public health is doubtless an interest of great delicacy and importance. Whatever power is in fact necessary to preserve it will be cheerfully conferred by the legislature, and carried into full effect by the courts.

But it can never be permitted that, even for the sake of the public health, any local, inferior board or tribunal shall repeal statutes, suspend the operation of the constitution, and infringe all the natural rights of the citizen. ,

I feel no hesitation in declaring this regulation void. Disobedience to it constitutes no crime. The prisoner is discharged.